691 F.2d 800
 Frank J. KELLY, Attorney General of Michigan and the
Commodity Futures Trading Commission, Plaintiffs-Appellees,
v.
James A. CARR and Charles P. Le-Mieux, III, d/b/a Lloyd Carr
and Company, a partnership; James A. Carr and Charles E.
Le-Mieux, III, d/b/a Lloyd Carr Financial Company, a
partnership; James A. Brien, Berry Brown, James A. Carr,
Michael D. Shuster and Ralph R. Zola, Defendants-Appellants.
 Nos. 78-1091, 78-1092, 78-5442 and 78-5460.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 21, 1979.
Decided May 16, 1980.
 
 Anthony M. Cardinale, Law Offices of F. Lee Bailey, Boston, Mass., for defendants-appellants in 78-1091, 78-1092 and 78-5460.
 Frank J. Kelley, Atty. Gen., of Michigan, Robert Derengoski, Sol. Gen., Lansing, Mich., Thomas L. Casey, John A. Field, III, Robert A. W. Boraks, Thomas B. Goodbody, Richard Nathan, John Gaine, Commodity Futures Trading Commission, Division of Enforcement, Washington, D. C., for plaintiffs-appellees in 78-1091 and 78-1092.
 Robert J. Dugan, Grand Rapids, Mich. (Court-appointed), for defendants-appellants in 78-5442.
 James S. Brady, U. S. Atty., Grand Rapids, Mich., for plaintiffs-appellees in 78-5442 and 78-5460.
 Glynn L. Mays, Peter W. Rothberg, Commodity Futures Trading Commission, Washington, D. C., for plaintiffs-appellees in 78-1091, 78-5442 and 78-5460.
 Frederic T. Spindel, Commodity Futures Trading Commission, Washington, D. C., for plaintiffs-appellees in all cases.
 Before LIVELY and KEITH, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 KEITH, Circuit Judge.
 
 
 1
 Defendants Carr and Lloyd Carr and Co., et al.[1] appeal judgments of the U.S. District Court for the Western District of Michigan, Honorable Noel P. Fox presiding, enjoining defendants from further violations of the Commodity Exchange Act[2] and imposing criminal contempt sanctions for violations of a temporary restraining order.
 
 
 2
 The state of Michigan, by its Attorney General, Frank J. Kelly, initiated a lawsuit against Lloyd Carr and Company alleging violations of various sections of both the Michigan Uniform Securities Act, MCLA-ss 451.501 et seq. (1977) and the Michigan Consumer Protection Act, MCLA-ss 445.901 et seq. (1977) for fraudulently transacting business related to the selling of commodities futures. This action was filed in the Circuit Court for the County of Ingham, a Michigan State Court on October 13, 1977. The defendants removed the case to the United States district court on October 31, 1977. Two days later, on November 2, 1977, the state of Michigan amended its complaint to include violations of the anti-fraud provisions of the Federal Commodity Exchange Act contained in 7 U.S.C. §§ 1 et seq. (1977).[3] On November 3, 1977, the Commodity Futures Trading Commission (C.F.T.C.) filed a "permissive" motion to intervene in the removed action under Rule 24(b) of the Federal Rules of Civil Procedure. Simultaneously with its motion to intervene on November 3, 1977, the C.F.T.C. filed a Motion for Temporary Restraining Order, Preliminary Injunction and Order Appointing a Receiver concomitant with its complaint for the same.
 
 
 3
 Thereafter, on November 7, 1977, the district court granted the Motion to Intervene and issued a Temporary Restraining Order explicitly in response to plaintiff's (the Attorney General) First Amended complaint for preliminary and permanent injunction and the Motion for Temporary Restraining Order (TRO). On December 5, 1977, the district court granted the preliminary injunction enjoining defendants from defrauding and deceiving customers with misleading information, and from destroying records. The injunction also compelled defendants to provide the Commission with access to company records. Additionally, a Special Master was appointed and notice of the injunction to all employees was directed.
 
 
 4
 On January 9, 1978, the C.F.T.C. filed an application for an Order to Show Cause why defendants should not be punished for criminal contempt. This application responded in part to the failure of Lloyd Carr's branch offices to provide the C.F.T.C. access to company books and records as mandated by the December 5, 1977 district court order. Indeed, following a hearing the district court found Appellants in contempt for violation of its order.
 
 
 5
 On appeal, appellants contend that both the injunction and the criminal contempt sanctions should be overturned because the enforcement of Michigan's Anti-Fraud statute by its Attorney General has been preempted by the Commodity Futures Trading Commission Act, 7 U.S.C. §§ 1 et seq., as amended, and the federal district court lacked subject matter jurisdiction by virtue of a defective removal. As the preemption issue is inextricably tied to the defective jurisdictional question, we address them as one.
 
 
 6
 Additionally, Appellant Shuster separately argues that his conviction for criminal contempt should be reversed on the substantive grounds that he had no notice of the terms of the injunction prior to his arrest.[4] We first must determine whether the district court had jurisdiction to enter the orders of November 7, 1977 and December 5, 1977. Secondly, we address the issue of whether, given the circumstances, the criminal contempt convictions can be permitted to stand.
 
 
 7
 To the extent that the district court assumed subject matter jurisdiction over the complaint filed by the state of Michigan, an examination of the applicable laws leads this court to conclude that the district court improvidently allowed removal. However, quite fortuitously, the somewhat convoluted configuration of facts and parties coupled with technical procedural rules permit affirmance of the injunction against the defendant Lloyd Carr & Co. To unravel this procedural knot, we must focus on how the district court acquired jurisdiction upon defendants' removal.
 
 
 8
 Because the underlying action involves commodities futures, an area whose regulation the Congress has committed to the Commodity Futures Trading Commission, we must ascertain the role left the states, as our first step in the analysis of this procedural puzzle.
 
 The Commodities Options Industry
 
 9
 The commodities business operates as a market place for contracts. The contracts traded are for the purchase or sale of specific amounts of a commodity which either already have been produced, or which will be produced in the future and delivered at a specified date. This latter group of contracts are labeled 'Commodity Futures.' A 'commodity option' is a contractual right to buy or sell a commodity or commodity future by some specific date at a specified, fixed price, known as the striking price. A contract entitling its owner to purchase the commodity is known as a 'call' while a contract to sell is referred to as a 'put.' In the simplest case, an option is created, or 'written' by the owner of a commodity or commodity futures contracts, who commits himself to sell his goods or contract. But an option can also be written by anyone else willing to take the chance that he will be able to cover his obligations in the futures market if the option purchaser decides to exercise the option. Such an option is described as "naked."[5]
 
 
 10
 Intimations of difficulties in the commodity options market came to the attention of Congress in the early 1970's: existing laws had not worked well in preventing abuses in the options industry. Options were an especially hospitable environment for abuse because a naked option could be created out of nothing. Responding to this and similar abuses, in 1974 Congress simultaneously amended the old Commodity Exchange Act and created the Commodity Futures Trading Commission (C.F.T.C.) to regulate the commodity futures industry.[6] The idea that the C.F.T.C. should regulate the area was firmly expressed.[7]
 
 
 11
 Despite the expressed authority of the Commission to regulate commodity futures, there was extensive discussion on whether the grant of exclusive authority actually was meant to totally preclude state involvement in the commodities industry.[8]I
 
 
 12
 Appellants contend that the commitment of regulatory authority to the Commission preempted the Attorney General from enforcing the State's antifraud laws.[9] Furthermore, assuming the preemption argument does not prevail, appellants argue that the federal district court did not have subject matter jurisdiction because the removal was based on violations of state law.[10]
 
 
 13
 Examination of appellants' argument suggests three (3) separate questions for discussion. First in 1976-77, did private parties or the State of Michigan have authority to enforce the Commodity Futures Trading Act or was such authority limited to the Commodity Futures Trading Commission? Second, if the state could not bring an action under the Act, was it similarly preempted from bringing state law actions for fraudulent conduct involving commodities? And finally, assuming the state could enforce the Act, was the forum exclusively federal?
 
 
 14
 Our research reveals that federal courts have been in some conflict over these questions.[11] In part the conflict stemmed from the contradictory signals emitted from the legislative history of the Commodity Future Trading Commission Act of 1974.[12] Since Congress provided the Commission a broad grant of authority to regulate the Act and pursuant to this authority, the Commission established a system of administrative remedies for members of the public harmed by the fraudulent "pressure selling" of commodity futures. Had the state filed its action in federal court and the Commission failed to intervene, the above questions would need be addressed. However this did not occur. We find it unnecessary to resolve what the state of the law was in 1976-77 with respect to a private right of action under the 1974 Act or even whether Michigan's state law was preempted by the federal enactment.
 
 
 15
 In the case before us, we have fraudulent conduct being attacked under both the Michigan statutes and the C.F.T.C. Act. Assuming the state court could have adjudicated the Attorney General's complaint under the two Michigan Statutes; it would still be impossible for the federal court to similarly exercise jurisdiction over the state claims.[13] And, assuming that the state could have sued under C.F.T.A., the exclusive forum for such an action is Federal District Court. Under Lambert Run Coal Co. v. Baltimore, Ohio R.R. Co.,[14] a case which can only be filed in federal court, but which is mistakenly filed in a state court, cannot be removed from the state to the federal forum. This being so, the Attorney General's subsequent amendment of his complaint, to include violations of the federal law, after the action had been removed could not cure the fact that the federal court did not have jurisdiction over any of the claims when the action was removed.
 
 
 16
 This court has already ruled in Bancohio Corp. v. Fox,[15] that in those areas where federal courts exercise exclusive jurisdiction, a federal district court to which a case is removed from state court must dismiss the action without prejudice for want of subject matter jurisdiction. Ironically, in this case the removal placed the parties in federal district court where Congress subsequently has determined such actions should be. However the application of the Lambert Run Rule dictates dismissing the state of Michigan from the law suit for lack of subject matter jurisdiction.
 
 
 17
 Assuming its continued viability there is no principled basis to avoid applying the Lambert Run Rule to the state of Michigan in this case. For whatever reason, Congress has made the federal courts the exclusive forum for actions brought under the Commodities Future Trading Act. Despite subsequent explicit authority to initiate complaints under the C.F.T.C. Act and retention of the right to enforce its own criminal and civil anti-fraud laws, Michigan cannot be a proper party in this suit in federal court.[16] We stress that today under the 1978 amendments, Michigan could exercise its prerogative and bring the complaint against Lloyd Carr and Company alleging violations of Michigan law in its state court. However, given the Michigan state complaint as the basis for the removal and our holding in Bancohio we are hard pressed to find federal subject matter jurisdiction in the court below. This result is compelled regardless of whether Michigan amended its complaint in state court or in federal court after the removal.
 
 
 18
 In light of the applicable law, the injunction cannot stand on the strength of the complaint filed by the state of Michigan. Having determined that the district court lacked jurisdiction over the complaint filed by the state of Michigan, we now explore whether the rulings below may be affirmed on the basis of the complaint filed by the intervening plaintiff, the Commodity Futures Trading Commission.
 
 II
 
 19
 Because intervention presumes a valid lawsuit in a court of competent jurisdiction, ordinarily the intervening party cannot breathe life into a non-existing action.[17] However, where the intervenor carries with it a separate and independent jurisdictional basis, it would be a senseless waste of judicial resources to require the parties to begin again merely to arrive at the same place. Therefore it has been held to be within a court's discretion to adjudicate the claims of a party who brings independent subject matter jurisdiction.[18]
 
 
 20
 Accordingly we conclude that the court below acquired jurisdiction at the moment the Commission intervened. Our holding that the administrative agency's separate and independent jurisdictional basis rescues the court ordered preliminary injunction acknowledges that the district court properly exercised its discretion. In this manner we resist becoming blinded by and vulnerable to tyranny by procedural rules at the cost of justice. Subject matter jurisdiction having attached with respect to the C.F.T.C. complaint, the trial court's preliminary injunction was a valid order.
 
 
 21
 The sole question remaining before us is whether the contempt citations against the defendants for violating the validly issued injunction should be affirmed.
 
 Contempt Citations
 
 22
 At a hearing, the trial court upon appellee's Motion to Show Cause why defendants should not be punished found that the appellants violated its December 5th order. Among other things the court instructed defendants to provide access to books and records for the Commission and to inform all employees of the preliminary injunction enjoining defendants from "pressure-selling" citizens with false and misleading information about commodity options anywhere in the United States. Following its finding that the defendants failed to provide access when C.F.T.C. agents visited the various offices throughout the nation or provide employees notice of the injunction, the contempt citations were issued.
 
 
 23
 In response, appellants advance three arguments. First, that deficient subject matter jurisdiction mandates overturning the contempt citations, has already been rejected with a finding of jurisdiction by virtue of C.F.T.C.'s separate and independent statutory basis.[19] Secondly, appellant Abrahams additionally argues that his "sentence time" should be reduced considering that the other defendants received less jail time.[20] But since Abrahams functioned as the mastermind in this fleecing operation, his contention that his punishment for the contempt was excessive is without merit.
 
 
 24
 Finally, appellant Shuster presents a more troublesome question. He argues that his pleas of guilty meant absolutely nothing because he was unaware of the contents of the injunction and that he should have been allowed to withdraw his plea under Rule 11 of the Federal Rules of Criminal Procedure.[21] As stated above, a portion of the injunction required the branch managers to notify employees that the injunction prohibiting pressurized selling of Commodity options through telephonic means had issued. Appellant Shuster admitted in open court that he, indeed, had failed to so inform the employees of the San Francisco Branch. However, on appeal Shuster insists that he never understood that the injunction required him to so inform his employees. It is basic to our jurisprudence that a man must know the crime to which he is pleading guilty before that guilty plea can be accepted. Rule 42(b) of the Federal Rules of Criminal Procedure governs those contempt cases occurring outside the actual presence of the court.[22] Predictably, Rule 42(b) requires prosecution on notice.
 
 
 25
 Appellant Shuster claims both that he had ineffective counsel because of an insufficient time for the preparation of the defense; and, more importantly, that he did not understand the nature of the charge against him. According to Shuster the injunction was in fact, served on his superior and by virtue of three telex messages he knew about the injunction. But he never knew that the injunction required him to inform his employees that the injunction had in fact issued. Ordinarily in this milieu, one might discern a hollow ring to an appellant's protestation that he never actually saw or read the contents of the injunction. Unfortunately, our examination of the record reveals far too much confusion for comfort on this critical issue. The government encourages affirmance on the ground that
 
 
 26
 "At a minimum after (Shuster's) hearing in California it is difficult to suppose that Shuster was not completely informed of the nature of the charges against him."
 
 
 27
 We are not inclined to rely on the possibility of such a probability. The record indicates that appointed counsel for appellant Shuster at one point did inform the court that he was inadequately prepared having taken over the defense only one week before the scheduled hearing. While we are unable to say with certainty that appellant Shuster did not understand the crime to which he pleaded guilty, it is sufficiently ambiguous that we remand for a hearing on this point.
 
 
 28
 Affirmed in part, reversed and remanded in part.
 
 
 
 [1]
 Appellants have appealed the order of November 7, 1977, issuing a temporary restraining order and granting the Commodities Futures Trading Commission's motion to intervene (Docket # 78-1091) as well as the order of December 5, 1977 granting plaintiffs' motion for preliminary injunction (Docket # 78-1092). Furthermore, appellants Abrahams, Brian, and Zola appeal from convictions of criminal contempt, (Title 18 U.S.C. § 401(3) (Docket # 78-5460) as does appellant Shuster (Docket # 78-5442). Since the same fact pattern spawned these various actions in the interest of judicial efficiency, on appeal, these four cases have been consolidated for one disposition
 
 
 [2]
 Pub.L. No. 93-463, 88 Stat. 1389, amending 7 U.S.C. § 1 (1970) (codified at 7 U.S.C.A. § 1 (Supp. 1, 1975), as amended by the Futures Trading Act of 1978, Pub.L. No. 95-405, 92 Stat. 865 et seq. (October 1, 1978) (hereinafter the Act)
 
 
 [3]
 However, a different sequence of events is reflected in Judge Fox's Memorandum Opinion dated December 5, 1977. He recites that the Attorney General amended his complaint, defendants petitioned for removal and the C.F.T.C. then moved to intervene as a party plaintiff. For purposes of deciding this appeal, the sequence as recorded by the docket sheet shall, of course, be deemed correct. It is crucial to understanding our resolution of this case to remember that both the Attorney General of Michigan and the Commodity Futures Trading Commission requested identical relief
 
 
 [4]
 Appellants Abrahams, Brian and Zola also seek reversal of their convictions for criminal contempt on the grounds that the district court lacked subject matter jurisdiction. Furthermore, Abrahams contends that his sentence (the maximum permitted under the statute, 18 U.S.C. § 401(3)) being of a longer duration than that of any of the other sentences imposed, should be reviewed on appeal
 
 
 [5]
 This discussion of the Commodities industry is taken from British American Commodity Options Corp. v. Bagley, 552 F.2d 482, 484-85 (2d Cir. 1977), cert. denied, 434 U.S. 938, 98 S.Ct. 427, 54 L.Ed.2d 297 (1977) (footnote eliminated). See also Commodity Futures Trading Commission, Glossary of Some Terms Commonly Used in the Futures Trading Industry 13 (1978) S.Rep. No. 95-850, 95th Cong., 2d Sess. 128 (1978), U.S.Code Cong. & Admin.News 1978, p. 2087
 
 
 [6]
 7 U.S.C. §§ 1-22 (1970 and Supp. III 1973) (amended 1974). For a full discussion of the changes made in the Commodity Exchange Act, see Johnson, The Changing Face of Commodities Regulation, 20 Prac.Law., re. 1974, at 27; Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand.L.Rev. 1 (1976); Note, The Role of the Commodity Futures Trading Commission under the Commodity Futures Trading Commission Act of 1974, 73 Mich.L.Rev. 710 (1975)
 
 
 [7]
 This exclusive jurisdiction provision, section 2(a)(1) of the Act states:
 That the (Commodity Futures Trading) Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is the character of . . . an option . . .), and transactions involving contracts of sale of a commodity for future delivery-traded or executed on a contract market designated pursuant to Section 7 of this title or (another) board of trade, exchange, or market . . . 7 U.S.C. § 2 (Supp. V 1975), as amended.
 
 
 [8]
 These questions are now largely academic because Congress in subsequent legislation, the Futures Trading Act of 1978, resolved the ambiguity with respect to the states' role in the Commodity Futures industry. See Note 2, supra. See also S.Rep. No. 95-850, 95 Cong., 2d Sess., reprinted in (1978) U.S.Code Cong. and Admin.News pp. 2087, 2101-2105
 
 
 [9]
 See Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8th Cir. 1971), aff'd 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), where the court stated: key factors in the determination of whether Congress has, by implication, preempted a particular area so as to preclude state attempts at dual regulation include, inter alia : (1) the aim and intent of Congress as revealed by the statute itself and its legislative history; (2) the pervasiveness of the federal regulatory scheme as authorized and directed by the legislation and as carried into effect by the federal administrative agency; (3) the nature of the subject matter regulated whether it is one which demands "exclusive federal regulation in order to achieve uniformity vital to national interests," and ultimately (4) "whether, under the circumstances of (a) particular case (state) law stands as an obstacle to the accomplishment and of the full purpose and objectives of Congress."
 It has been suggested that Supreme Court cases involving preemption of state law by federal statutes can be rationalized according to what the state law, protects citizens inside territorial boundaries from physical injury, other dangers or people outside the state borders. When the law protects physical injury inside the state boundaries, the deference has been the greatest. Note, A Framework for Preemption Analysis, 88 Yale L.J. 363 (1978).
 I am persuaded by my reading of Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 141, 83 S.Ct. 1210, 1216, 10 L.Ed.2d 248 (1963), that either a congressional intent to preempt the field or a conflict between federal and state statutes is needed before a state statute must defer to federal law under the preempting doctrine.
 
 
 [10]
 Civil Procedure students should recognize this as the "derivative jurisdiction" doctrine. See discussion beginning at 7 infra
 
 
 [11]
 See Moody v. Bache & Co., 570 F.2d 523 (5th Cir. 1978), and Fisher v. Rosenthal & Co., a district court decision from Northern Texas. 48 U.S.L.W. 2441 (January 8, 1980)
 
 
 [12]
 Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states. In reference to a possible C.F.T.C.-state overlap in jurisdiction/regulation, the Joint Explanatory Statement of the Committee of Conferees of the C.F.T.C.A. clarified the position by stating:
 Under the exclusive grant of jurisdiction to the Commission the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned. Therefore, if any substantive state law regulating future trading is contrary to or inconsistent with federal law, the federal law would govern. In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the states.
 Senate Comm. on Agriculture, Nutrition and Forestry, 3d Cong., 2d Sess., Commodity Futures Trading Comm'n Act of 1974, at 11-12 (Comm. Print 1974).
 A reading of the above provision suggests the states had been totally preempted from the field of commodity futures. However, the 1974 Act stated: "Nothing in this section shall supercede or limit the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2.
 To add to the confusion, the Commission issued a release articulating the view that states could, themselves, enforce the 1974 Act in a parens patriae action. CCH Comm. Fut.L.Rep. P 20,218 (October 8, 1976). We reiterate, however, regardless of the state of the law in 1976-77, these problems no longer exist.
 In a new section, 6(d), added during the 1978 authorization hearings the Future Trading Act of 1978 specifically authorizes a designated state official to bring an action enforcing "any provisions of this chapter, rule, or regulation under the Commission." However Paragraph Seven of the same sub-section is of crucial importance since it explicitly permits state officials to proceed "in State court on the basis of any alleged violation of any general civil or criminal antifraud statute of such State." 7 U.S.C. § 13a-2 (1978).
 Obviously the statutory language of 7 U.S.C. § 13a-2(1), (7) contemplates an increased role for the state officials in the enforcement of the Act. This role permits suits brought under the Act by state officials in federal courts in addition to the enforcement of the state civil or criminal anti-fraud statutes. But from the legislative history of the Futures Trading Act of 1978 it is equally apparent that individual states are without authority to adjudicate claims of the C.F.T.C. Act in state courts. As reported, the legislative commentary reads:
 III.
 The statute on which all actions brought under this section is to be based is the Commodity Exchange Act. The states would not, in these actions, be involved in enforcement of their local laws. Consistent with the commission's exclusive jurisdiction and preemption of state regulatory activity enacted in 1974, and with the present decision to make federal law the basis for all actions brought under this section, it was also determined to make the federal courts the exclusive forum for such (those brought under the Act) actions. This is consistent with the pattern established in the Securities Exchange Act of 1934, which requires private actions brought under that statute to proceed in the federal courts. The vast bodies of decisional law relating to SEC Rule 10(b)-5 Securities, "fraud" has developed exclusively in the federal courts. In this way, it is believed, a readily available, coherent body of law is most likely to evolve, subject to review and correction within the single, unified system of federal courts, employing common procedures throughout the United States.
 It is understood that some states may desire to bring emergency actions in their own courts and may desire to seek relief other than injunctive relief. Notwithstanding the provisions of this section, it will remain possible, as it has been in the past for an authorized state official to proceed in state court on the basis of an alleged violation of any general civil or criminal antifraud statute. Futures Trading Act of 1978, P.L. 95-405 (1978 U.S.Code Cong. and Admin.News, pp. 2087, 2113.)
 
 
 [13]
 We do note in passing that diversity jurisdiction might have been an alternative basis for removal; this issue was not raised. Although diversity jurisdiction was present in Bancohio v. Fox, 516 F.2d 29 (6th Cir. 1975), dismissal was still the proper result in that case
 
 
 [14]
 258 U.S. 377, 382, 42 S.Ct. 349, 351, 66 L.Ed. 671 (1922). Simply stated, the Lambert rule is that a federal district court acquires derivative jurisdiction on removal and if the state court from which the action was removed has no jurisdiction, the federal court acquires no jurisdiction
 Applying this rule to these facts there could be no federal jurisdiction.
 
 
 [15]
 516 F.2d 29 (6th Cir. 1975)
 
 
 [16]
 A reading of the legislative history surrounding the 1978 reauthorization proceedings reveals that Congress placed intentional limitations on the states' role on the enforcement of the C.F.T.C. Act. Specifically, the states are permitted to enforce the Act, but only if initiated in a federal forum. Thus Congress has carefully and clearly defined the boundaries of state involvement in the commodities arena. This is not to suggest that the states are prohibited from enforcing their civil and criminal antifraud status when conduct is violative of the statutes, as the Futures Trading Act explicitly recognizes. See note 12, supra
 Our analysis of Part I of this opinion placed extensive reliance on the Futures Act of 1978, enacted after the district court's decision. We are well aware of the contemporaneous legislative history rule generally applied in statutory construction, but we would be remiss were we to ignore the clarification added in the Futures Trading Act of 1978. T.V.A. v. Hill, 437 U.S. 153, 202, 98 S.Ct. 2279, 2305, 57 L.Ed.2d 117 (1977) (Powell, J., dissenting).
 
 
 [17]
 United States ex rel. Texas Portland Cement Co. v. McCord, 233 U.S. 157, 34 S.Ct. 550, 58 L.Ed. 893 (1914)
 
 
 [18]
 Miller & Miller Auction, Inc. v. G. W. Murphy Indus., Inc., 472 F.2d 893 (10th Cir. 1973); Fuller v. Volk, 351 F.2d 323, 326, 329 (3rd Cir. 1965); Healy v. Edwards, 363 F.Supp. 1110 (E.D. Louisiana 1973), vacated, 421 U.S. 772, 95 S.Ct. 2410, 44 L.Ed.2d 685 (1975)
 
 
 [19]
 Even assuming the injunction invalid by reasons urged by appellants, until litigated and determined so by an appellate court, the appellants remain obliged to obey the court order. See Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1966); United States v. Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1946)
 
 
 [20]
 Appellant Abrahams received the maximum sentence that the court could impose without a jury trial (six months). Mr. Abrahams certainly has been fortunate in the past with government actions against him. See United States v. Abrahams, 604 F.2d 386 (5th Cir. 1979)
 
 
 [21]
 Rule 11 now provides in pertinent part:
 "Advice to Defendant. Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform him of, and determine that he understands, the following:
 "(1) the nature of the charge to which to plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law; and
 "(2) if the defendant is not represented by an attorney, that he has the right to be represented by an attorney at every stage of the proceeding against him and, if necessary, one will be appointed to represent him; and
 "(3) that he has the right to plead not guilty or to persist in that plea if it has already been made, and he has the right to be tried by a jury and at that trial has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him, and the right not to be compelled to incriminate himself; and
 "(4) that if he pleads guilty or nolo contendere there will not be a further trial of any kind, so that by pleading guilty or nolo contendere he waives the right to a trial; and
 "(5) that if he pleads guilty or nolo contendere, the court may ask him questions about the offense to which he has pleaded, and if he answers these questions under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for the perjury or false statement."
 
 
 [22]
 In pertinent part Rule 42(b) reads:
 The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describes it as such. 42(b) Federal Rules of Criminal Procedure.