787 F.2d 1421
 STATE CORPORATION COMMISSION OF the STATE OF KANSAS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Telephone and Telegraph Company, General Telephone
Company of Florida, Mountain States Telephone & Telegraph
Company, Northwestern Bell Telephone and Pacific Northwest
Bell Telephone Company, MCI Telecommunications Corporation,
Bellsouth Corporation on Behalf of Its Operating
Companies--Southern Bell Telephone and Telegraph Company,
and South Central Bell Telephone Company; the Bell Atlantic
Telephone Companies--the Bell Telephone Company of
Pennsylvania, the Chesapeake & Potomac Telephone Companies
of Maryland, Virginia, West Virginia, and District of
Columbia, the Diamond State Telephone Company, and New
Jersey Bell Telephone Company; the Ameritech Operating
Companies--Illinois Bell Telephone Company, Indiana Bell
Telephone Company, Michigan Bell Telephone Company, the Ohio
Bell Telephone Company and Wisconsin Bell; the Nynex
Telephone Companies--New York Telephone Company, and New
England Telephone and Telegraph Company; Southwestern Bell
Telephone Company, National Association of Regulatory
Utility Commissioners, and Reservation Telephone
Cooperative, et al., Intervenors.
 No. 84-2259.
 United States Court of Appeals,
Tenth Circuit.
 April 1, 1986.
 
 Lee H. Woodard, Special Counsel, of Woodard, Blaylock, Hernandez, Pilgreen & Roth, Wichita, Kan. (Brian J. Moline, General Counsel, and James G. Flaherty, Staff Counsel, of Kansas Corporation Commission, Topeka, Kan., with him, on brief), for petitioner.
 Linda L. Oliver, Counsel, F.C.C., Washington, D.C. (John E. Ingle, Deputy Associate General Counsel with her, on brief), for respondents.
 Michael Boudin of Covington & Burling, Washington, D.C. (Elizabeth V. Foote with him, on brief for AT & T and Listed Intervenor Bell Operating Companies; also on brief were Thomas J. Reiman, Chicago, Ill., and Alfred Winchell Whittaker, Washington, D.C., for Ameritech Telephone Companies; Judith A. Mayenes, W. Preston Granbery, and Robert B. Stechert, Basking Ridge, N.J., for AT & T; Daniel J. Whelan and David K. Hall Washington, D.C., for Bell Atlantic Telephone Companies; William J. Byrnes, Washington, D.C., for MCI; Saul Fisher, White Plains, N.Y., and John B. Messenger, Washington, D.C., for NYNEX Telephone Companies; Vincent L. Sgrosso, Atlanta, Ga., for BellSouth Telephone Companies; Michael C. Cavell, Topeka, Kan., for Southwestern Bell Telephone Co.; David S. Sather and Robert B. McKenna, Washington, D.C., for Mountain States Telephone and Telegraph Co., Northwestern Bell Telephone Co., and Pacific Bell Telephone Company), for intervenors.
 David Cosson, Washington, D.C. (Paul G. Daniel with him, on brief, for The Reservation Telephone Cooperative, et al.; also on brief were Paul Rodgers, General Counsel, Charles D. Gray, Asst. Gen. Counsel, and Genevieve Morelli, Deputy Asst. Gen. Counsel, National Ass'n of Regulatory Utility Commissioners, Washington, D.C.), for intervenors.
 William Malone, Stamford, Conn., James R. Hobson of Washington, D.C., and James V. Carideo, of counsel, Tampa, Fla., filed a brief, for intervenor General Telephone Co. of Florida.
 Before SEYMOUR, SETH and BALDOCK, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 Petitioner challenges a declaratory order of the Federal Communications Commission (FCC or Commission). The order would preempt state utility commissions from altering the sampling periods employed by local telephone companies to separate the costs of equipment used in both interstate and intrastate service and to divide interstate revenues among themselves. We affirm.
 
 I.
 
 2
 The FCC and state utility commissions regulate charges for interstate and intrastate service respectively. Appropriate rates depend largely upon the investment and operating costs of individual companies. Because many items of telephone equipment are used for both interstate and intrastate calls, allocating the cost of such equipment bears directly upon the rates customers will pay for each form of service. The process of "jurisdictional separations" determines how these costs are allocated for ratemaking purposes. Since 1947, separations have been accomplished using a manual developed over the years by the FCC and state utility commissions.
 
 
 3
 Jointly used equipment may be traffic sensitive or not. The cost of traffic sensitive equipment varies according to its use in either interstate or intrastate service, and it has generally been allocated on that basis. In contrast, the cost of non-traffic sensitive equipment remains constant irrespective of use. Such equipment includes telephones, wiring within customers' homes or offices, and lines connecting individual telephones to local switching offices. The FCC has labored for years to develop an appropriate formula to allocate the costs associated with non-traffic sensitive equipment. Under the 1970 Ozark Plan,[1] each local company sampled calls during a representative period to ascertain the relative amount of time that such equipment was used for interstate calls. The resulting figure is known as a subscriber line use ratio, or SLU. As a matter of policy, the separations manual then applied a formula which shifted approximately 3.3 percent of non-traffic sensitive costs to the interstate jurisdiction for every 1 percent of use. The percentage figure generated by the formula and applied to separate a carrier's total non-traffic sensitive costs is known as its subscriber plant factor, or SPF.
 
 
 4
 Between 1970 and 1982, the market for long distance services became markedly competitive. Interstate calling increased substantially in relation to intrastate use, and the multiplier aspect of the SPF formula shifted more non-traffic sensitive costs into the interstate jurisdiction. In response to these developments, the FCC convened a federal-state joint board to reexamine separations policy, including the treatment of non-traffic sensitive costs. The Commission ultimately adopted the joint board's proposals with minor modifications. See Amendment of Part 67 of the Commission's Rules and Establishment of a Joint Board, 89 F.C.C.2d 1 (1982). The resulting regulations were affirmed on review. See MCI Telecommunications Corp. v. FCC, 750 F.2d 135 (D.C.Cir.1984).
 
 
 5
 Concluding that increases in long distance calling may have unduly inflated the non-traffic sensitive costs allocated to interstate use, the FCC determined that carriers' SPF should be frozen at 1981 levels pending the development of comprehensive revisions in separations policy. See id. at 139, 141. An accompanying amendment to the separations manual specified that a telephone company's average 1981 SLU ratio should be factored into the SPF formula in order to accomplish this objective.[2] Although the amendment itself did not fix the representative period to be used in calculating SLU, the freeze order states that all allocative variables should remain constant, see Amendment of Part 67, 89 F.C.C.2d at 6, and that carriers would continue to conduct cost studies and calculate SPF as they had done in the past, see id. at 14-15. The Commission left open for joint board consideration whether seven-day usage studies should replace five-day studies.[3] See id. at 22. Based upon these assumptions, the freeze order included specific figures for the Bell system's frozen SPF and SLU. See id. at 5 & n. 12.
 
 
 6
 The order issued in this case emerged from a subsequent dispute between Southern Bell and General Telephone of Florida (GTF). Each company provides local telephone service and handles interstate calls as well. Since 1970, Southern Bell had administered a single pool of interstate revenues under what is known as a settlement agreement between the two companies. Under this agreement, Southern Bell reimbursed GTF for its interstate costs in accordance with the separations manual and the SPF formula in particular. In 1980, seeking to increase its share of interstate revenues, GTF requested that seven-day rather than five-day studies be used for the purpose of calculating SPF. Southern Bell refused. GTF then persuaded the Florida Public Service Commission to require that Southern Bell accept seven-day studies. Following Bell's appeal to state court, the Florida Commission obtained a remand and reversed its initial decision with respect to interstate settlements.
 
 
 7
 Southern Bell had also petitioned the FCC to preempt Florida from ordering carriers to adopt new sampling periods for interstate settlement purposes. Although Florida had reversed itself, three other states had recently required the use of seven-day studies for separations purposes and others appeared ready to follow. Adjustments of this kind would increase carriers' SPF and, as a result, the proportion of their non-traffic sensitive costs allocated to interstate use. Accordingly, after soliciting public comment, the FCC concluded that declaratory action was called for and ruled that state regulatory commissions were preempted from prescribing the time period to be used by carriers in calculating SPF for either interstate settlement or jurisdictional separations purposes. See Establishment of Interstate Toll Settlements and Jurisdictional Separations Requiring the Use of Seven Calendar Day Studies by the Florida Public Service Commission, 93 F.C.C.2d 1287 (1983). The Commission based its ruling upon statutory authority conferred by the Communications Act of 1934, 47 U.S.C. Secs. 151 et seq. (1982), and upon the conclusion that state regulation would both violate the FCC's freeze order and frustrate uniform federal regulation of rate base allocation. The preemption order itself expressed no opinion on the merits of any particular time period which carriers might use to calculate SPF, see 93 F.C.C.2d at 1287 n. 1, but left the matter for joint board resolution.
 
 
 8
 Following requests for reconsideration, including one filed by petitioner, the FCC reaffirmed both the merits of its earlier ruling and the propriety of proceeding via declaratory adjudication. See Establishment of Interstate Toll Settlements and Jurisdictional Separations, 98 F.C.C.2d 777 (1984). The State Corporation Commission of Kansas then filed a petition for review in this court, challenging that portion of the preemption order which pertains to jurisdictional separations.
 
 II.
 
 9
 The Supremacy Clause of the Constitution establishes the primacy of federal over state law. State legislative and regulatory provisions may be preempted (1) when Congress, in the course of enacting a federal statute, has expressed its intention to preempt; or (2) when it is clear, in the absence of such a declaration, that Congress has intended to occupy an entire field of regulation; or (3) when the enforcement of state law would conflict with federal law or otherwise frustrate achievement of Congressional objectives. Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984); Michigan Canners & Freezers Association v. Agricultural Marketing & Bargaining Board, 467 U.S. 461, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984); Guschke v. City of Oklahoma City, 763 F.2d 379, 383 (10th Cir.1985).
 
 
 10
 In this case, it is sufficient to consider whether the FCC's own decision to preempt is Congressionally sanctioned and reasonable.
 
 
 11
 "Federal regulations have no less preemptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily.... When the administrator promulgates regulations intended to pre-empt state law, the court's inquiry is similarly limited:
 
 
 12
 'If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' "
 
 
 13
 Fidelity Federal Savings & Loan Association v. De La Cuesta, 458 U.S. 141, 153-54, 102 S.Ct. 3014, 3022-23, 73 L.Ed.2d 664 (1982) (citation omitted) (quoting United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)); Crisp, 467 U.S. at 699, 104 S.Ct. at 2700.
 
 
 14
 The powers delegated to the FCC encompass plenary authority to regulate jurisdictional separations. Section 221(c) of the Communications Act states that the Commission may "classify the property" of "carriers engaged in wire telephone communication" and "determine what property of said carrier[s] shall be considered as used in interstate or foreign telephone toll service." 47 U.S.C. Sec. 221(c). In affording the states and affected carriers an opportunity to be heard, see id., Congress implied that the Commission's final decisions are indeed binding. Cf. Shields v. Utah Idaho Central Railroad, 305 U.S. 177, 182, 59 S.Ct. 160, 163, 83 L.Ed. 111 (1938) (construing comparable provision of Interstate Commerce Act).
 
 
 15
 In 1971, Congress amended the Communications Act to provide for expanded state involvement in the formulation of separations policy. See Federal State Communications Joint Board Act, Pub.L. No. 92-131, 85 Stat. 363 (1971) (codified at 47 U.S.C. Sec. 410). Section 410(c) establishes a federal-state joint board procedure to advise the FCC on separations matters, and authorizes the participation of state board members in Commission deliberations. Under this section, however, the states are not entitled to vote on final separations decisions. See id.; see also S.Rep. No. 362, 92d Cong., 1st Sess. 5, reprinted in 1971 U.S.Code Cong. & Ad.News 1511, 1515; H.R.Rep. No. 429, 92d Cong., 1st Sess. 3 (1971). The provision of additional procedural mechanisms for state input confirms the purely advisory role of the states. See, e.g., National Association of Regulatory Utility Commissioners v. FCC, 746 F.2d 1492, 1499-1500 (D.C.Cir.1984) (NARUC ); North Carolina Utilities Commission v. FCC, 552 F.2d 1036, 1043, 1046 (4th Cir.) (NCUC II ), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). The FCC retains ultimate authority to prescribe uniform separations procedures. E.g. Illinois Bell Telephone Co. v. Illinois Commerce Commission, 740 F.2d 566, 567 (7th Cir.1984).
 
 
 16
 The authority conferred by sections 221(c) and 410(c) enables the FCC to carry out its basic function under the Act: to govern "all interstate and foreign communication by radio or wire." See 47 U.S.C. Sec. 151, 152(a). As one of its specific responsibilities, the Commission superintends the rates that carriers charge for interstate telephone calls. See id. Secs. 201-205. Appropriate rates depend upon carriers' revenue requirements, which in turn derive from whatever costs are assigned to the interstate jurisdiction. The separations process determines this allocation. FCC authority under sections 221(c) and 410(c) is thus a vital adjunct to the Commission's ratemaking powers under the Act.
 
 
 17
 The FCC's decision to preempt an area of separations regulation represents a reasonable exercise of its statutory authority. Whenever state regulation would frustrate achievement of a federal regulatory objective, FCC jurisdiction is paramount and conflicting state enactments must yield. Computer & Communications Industry Association v. FCC, 693 F.2d 198, 214-15 (D.C.Cir.1982) (Computer II ), cert. denied, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983); accord NCUC II, 552 F.2d 1036; New York Telephone Co. v. FCC, 631 F.2d 1059 (2d Cir.1980); Puerto Rico Telephone Co. v. FCC, 553 F.2d 694 (1st Cir.1977). "FCC regulations must preempt any contrary state regulations where the efficiency ... of the national communications network is at stake...." NCUC II, 552 F.2d at 1046; see also North Carolina Utilities Commission v. FCC, 537 F.2d 787, 793 (4th Cir.) (NCUC I ) (state order impairing policy for connection of customer equipment with interstate network), cert. denied, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976).
 
 
 18
 In imposing an SPF freeze, the Commission had already determined that effective governance of interstate service demanded at least a temporary halt in the growth of non-traffic sensitive costs being allocated to interstate service. State-ordered modifications in the sampling periods previously employed by carriers to calculate SPF would alter this factor. Switches from five- to seven-day studies, such as Florida and Kansas have purported to mandate, would shift millions of dollars annually into the interstate jurisdiction in violation of the freeze order's express purpose. "[A]ny growth in SPF," the FCC's preemption order concluded, "would result in the inequitable treatment of interstate users." 93 F.C.C.2d at 1303.
 
 
 19
 In forbidding state regulation, the Commission specifically construed its original freeze order as permitting only certain carrier-initiated changes in the factors which yield SPF. See id. at 1303-04. This interpretation is entitled to deference on review unless it is plainly wrong or inconsistent with the FCC's regulation. See United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); Devon Corp. v. FERC, 662 F.2d 698, 700 (10th Cir.1981). The text of the order reveals a clear and unequivocal intent that not only SPF, but all of the variables which generate this figure, should be held constant. The Commission further contemplated that telephone companies would continue to conduct usage studies, select sampling periods for that purpose, and otherwise apply the SPF formula as they had done in the past. Subsequent joint board proceedings were to address whether the length of carrier sampling periods should be directly prescribed. State regulation would plainly thwart the FCC's effort to maintain all aspects of the status quo while the joint board deliberated. The freeze order thus provides a sound basis for federal preemption.
 
 
 20
 Petitioner cannot avoid the order's import by focusing exclusively upon the separations manual and its failure to supply a definitive representative period. In an analogous case, New York Telephone v. FCC, 631 F.2d 1059, the Commission had declined to impose a tariff of its own for certain interstate services. Even so, an alternative form of regulation requiring the submission of proposed tariffs for FCC approval was no less effective in preempting tariffs unilaterally imposed by the states. See id. at 1066-67; see also Computer II, 693 F.2d at 217. Although the separations manual does not fix the length of carrier sampling periods, the freeze order forecloses state regulatory commissions from doing so themselves.[4]
 
 
 21
 The FCC's present exercise of jurisdiction does not improperly invade state authority to regulate intrastate communications. Section 152 of the Communications Act divides regulatory prerogatives between federal and state authorities: the Act and the FCC's jurisdiction apply to "all interstate and foreign communications," see 47 U.S.C. Sec. 152(a), but generally not to "charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service," see id. Sec. 152(b). This section has been uniformly interpreted as depriving the FCC of jurisdiction over local matters only when "their nature and effect are separable from and do not substantially affect" the regulation of interstate communications. NCUC I, 537 F.2d at 793; accord Computer II, 693 F.2d at 214-15; New York Telephone, 631 F.2d at 1065-66; Puerto Rico Telephone, 553 F.2d at 699-700. Before Congress passed the Communications Act, the so-called Shreveport rate case, Houston, E & W Texas Railway v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), had upheld an Interstate Commerce Commission order that local railroad rates may not undercut rates for comparable interstate service. Section 152(b) does no more than confirm that the states retain jurisdiction over purely local calls, notwithstanding any indirect economic effect upon the interstate market of the kind present in Shreveport. NARUC, 746 F.2d at 1500; Computer II, 693 F.2d at 215-16 & n. 99. State regulation which formally restricts only intrastate communications may not stand when it encroaches substantially upon federal authority over interstate matters. E.g., NCUC I, 537 F.2d at 793.
 
 
 22
 Jurisdictional separations involve a clear overlap of federal and state concerns. The relative apportionment of equipment costs bears directly upon the ratemaking function of both the FCC and state utility commissions. "The determination of rate base at the federal level ... has a strong relation to the rates which are charged at the local level." S.Rep. No. 362 at 3, 1971 U.S.Code Cong. & Ad.News at 1513. Conversely, if the states were permitted to increase SPF via the prescription of carrier sampling periods, the interstate rate base would increase proportionately as a result. Rate adjustments would be needed to cover these additional costs. State regulation would thus encroach upon core federal authority over interstate communications, as well as frustrate the established policy that SPF remain constant. Although costs rather than physical facilities are at issue in this case, the distinction in no way diminishes the potential for conflict. See Virginia State Corporation Commission v. FCC, 737 F.2d 388, 396 (4th Cir.1984); see also Computer II, 693 F.2d at 216. Dual regulation is impossible under the circumstances of this case.
 
 
 23
 Section 221(b) affords the states no further protection from federal preemption. The language of this section is quite sweeping: it provides that the FCC may not exercise jurisdiction over state-regulated charges, facilities, or other matters "for or in connection with ... telephone exchange service ... even though a portion of such exchange service constitutes interstate or foreign communication." 47 U.S.C. Sec. 221(b). The section's legislative history, however, establishes beyond doubt that it was intended only to maintain state regulation of local exchange services that happen to overlap state lines. Computer II, 693 F.2d at 216-17; New York Telephone, 631 F.2d at 1064-65; Puerto Rico Telephone, 553 F.2d at 698-99; NCUC II, 552 F.2d at 1045; NCUC I, 537 F.2d at 795.
 
 
 24
 The FCC's resort to declaratory adjudication does not vitiate the effectiveness of preemption. The choice between rulemaking and adjudication is committed to the sound discretion of administrative agencies governed by the Administrative Procedure Act (APA). NLRB v. Bell Aerospace Co., 416 U.S. 267, 290-95, 94 S.Ct. 1757, 1769-72, 40 L.Ed.2d 134 (1974). Preemption decisions by the FCC are no exception. See, e.g., New York State Commission on Cable Television v. FCC, 669 F.2d 58, 62 n. 9 (2d Cir.1982); NCUC I, 537 F.2d at 790-91 & n. 2; see also Brookhaven Cable Television, Inc. v. Kelly, 573 F.2d 765, 768 (2d Cir.1978), cert. denied, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979).
 
 
 25
 The decision to proceed via declaratory adjudication was not an abuse of discretion under the circumstances of this case. The APA authorizes the issuance of declaratory orders "to terminate a controversy or remove uncertainty." 5 U.S.C. Sec. 554(e). Because the FCC's freeze order did not specify the sampling periods to be used in calculating SPF, states such as Kansas have sought to fill a perceived gap in the federal regulatory scheme. Federal preemption serves to clarify the boundary of state regulatory power in terms of the FCC's paramount authority over separations matters and the existing policy that SPF should remain constant. The Commission neither defined "representative period" nor otherwise amended the separations manual. The order issued in this case instead proscribed state interference with carriers' already established methods of calculating SPF under the manual and the freeze order. FCC preemption maintained the status quo while a federal-state joint board developed proposals to amend the manual. Only later did the Commission decide, through more formal procedures, that seven-day studies should be used to calculate SPF once the freeze had expired. The FCC's preemption order enacted no new regime of rights and duties which would warrant the procedural safeguards of formal rulemaking. See Batterton v. Marshall, 648 F.2d 694, 705 n. 58 (D.C.Cir.1980) (court will look beyond labels to ascertain intent and effect of agency action). Moreover, the Commission issued its order only after providing public notice and an opportunity for interested parties, including Kansas, to comment.
 
 
 26
 Similar considerations dispose of the contention that the FCC was obliged to obtain the recommendation of a joint board before preempting. Section 410(c) requires such consultation, but only when the Commission engages in formal rulemaking. Because the FCC formulated no substantive rule to govern the separations process, there was no need to submit the question of preemption to a joint board.
 
 III.
 
 27
 For the reasons stated in this opinion, the order of the Federal Communications Commission preempting state utility commissions from requiring local telephone companies to adopt any particular SPF sampling period is affirmed.
 
 
 
 [1]
 See Separations Manual (1971 ed.); Prescription of Procedures for Separating and Allocating Plant Investment, Operating Expenses, Taxes and Reserve Between the Interstate and Intrastate Operations of Telephone Companies, 26 F.C.C.2d 247 (1970) (amending the manual and incorporating it by reference in the Code of Federal Regulations). The current separations manual is codified at 47 C.F.R. Secs. 67.1 et seq. (1985)
 
 
 [2]
 The amendment modifies p 23.444 of the 1971 separations manual to read as follows:
 "The cost of subscriber line outside plant in Category 1.3 assigned to message telephone services in the study area, as determined in p 23.444, is apportioned between state and interstate operations by the application, to the cost of such plant, of a subscriber plant factor, which is the sum of the following:
 (a) Annual average interstate subscriber line use (SLU), for the calendar year 1981, representing the interstate use of the subscriber plant as measured by the ratio of interstate holding time minutes of use to total holding time minutes of use applicable to traffic originating and terminating in the study area, multiplied by .85, the nationwide ratio of (1) subscriber plant costs assignable to the exchange operation per minute of exchange use to (2) total subscriber plant cost per total minute of use of subscriber plant, plus
 (b) Twice the annual average interstate subscriber line use ratio for the study area for the calendar year 1981, multiplied by the annual average composite station rate ratio used for the calendar year 1981 (ratio of (1) the nationwide, industry-wide average interstate initial 3-minute station charge at the study area average interstate length of haul to (2) the nationwide, industry-wide average total toll initial 3-minute station charge at the nationwide average length of haul for all toll traffic for the total telephone industry)."
 
 
 [89]
 F.C.C.2d at 32 app. A. (footnote omitted) (emphasis in original to indicate modifications)
 
 
 [3]
 The FCC later established revised separations procedures based upon further joint board proposals. See Amendment of Part 67, 96 F.C.C.2d 781 (1984), review pending sub nom. Rural Tel. Coalition v. FCC, No. 84-1110 (D.C.Cir.). Under this plan, the SPF freeze would remain in effect through 1985, when a transition would begin to a formula designed to allocate a flat 25% of non-traffic sensitive costs to interstate service. The Commission ordered the use of seven-day studies for separations purposes, but on a prospective basis only. The SPF freeze would remain unaffected by this aspect of the decision
 
 
 [4]
 Petitioner further contends that Sec. 11.18(h) of the manual authorizes the states to decide which joint costs shall ultimately be included in intrastate rate proceedings. This argument was not raised before the FCC and is therefore not properly presented on review. See Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 680-84 (D.C.Cir.1983); 47 U.S.C. Sec. 405 (1982). In any case, the argument is patently unsound. Section 11.18 provides that both federal and state regulators may decide that certain costs claimed by carriers are not appropriate for recovery from customers, yet the provision properly applies only after the separations procedure set forth in the manual has already allocated total costs between interstate and intrastate jurisdictions. Any other interpretation would eviscerate the separations process mandated by the manual