**COLORADO PUBLIC UTILITIES COMMISSION and State of Colorado, Plaintiffs–Appellees,**

v.

**Lawrence HARMON and United States Department of Energy, Defendants–Appellants,**

Wisconsin Electric Power Company, Virginia Power Company, TU Electric Company, Rochester Gas and Electric Corporation, Public Service Electric & Gas Company, Pennsylvania Power & Light Company, Northern States Power Company, Northeast Utilities, New York Power Authority, Georgia Power Company, Florida Power & Light Company, Duquesne Light Company, Commonwealth Edison Company, Carolina

---

1572

Power & Light Company, Baltimore Gas & Electric Company, American Electric Power Service Corporation, Alabama Power Company, State of California, State of Illinois, State of Michigan, State of Minnesota, State of Nevada, State of Texas, State of Vermont, State of Virginia, State of Washington, State of Wisconsin, New Mexico Health and Environment Department, the Environmental Defense Fund, Amici Curiae.

No. 89–1288.

United States Court of Appeals,
Tenth Circuit.

Dec. 18, 1991.

Kenneth Starr (Michael Jay Singer and Alfred Mollin, Dept. of Justice, Washington, D.C., and Michael J. Norton, U.S. Atty., and Stuart M. Gerson, Asst. Atty. Gen., on the briefs), Dept. of Justice, Washington, D.C., Henry Gill and P. Benjamin Underwood, Office of Gen. Counsel, Dept. of Energy, C. Dean McGrath, Jr., Acting Gen. Counsel, Dept. of Transp., and Barbara Betsock and Edward H. Bonekemper, III, Office of Chief Counsel, Research and Special Programs Admin., Dept. of Transp., of counsel, for defendants-appellants.

Florence J. Phillips (Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., and Mana Jennings–Fader, Asst. Atty. Gen., Denver, Colo., with her on the briefs), Sp. Asst. Atty. Gen., Cockrell, Quinn & Creighton, Denver, Colo., for plaintiffs-appellees.

Harry H. Voigt, Leonard M. Trosten, and Margaret M. Mlynczak, LeBoeuf, Lamb, Leiby & Macrae, Washington, D.C., on the brief for amici curiae Wisconsin Elec. Power Co., Virginia Power Co., TU Elec. Co., Rochester Gas and Elec. Corp., Public Service Elec. & Gas Co., Pennsylvania Power & Light Co., Northern States Power Co., Northeast Utilities, New York Power Authority, Georgia Power Co., Florida Power & Light Co., Duquesne Light Co., Commonwealth Edison Co., Carolina Power & Light Co., Baltimore Gas & Elec. Co., American Elec. Power Service Corp., and Alabama Power Co.

Donald J. Hanaway, Atty. Gen., and Carl A. Sinderbrand, Asst. Atty. Gen., State of Wis., and Neil F. Hartigan, Atty. Gen., Michelle Jordan, Chief, Environmental Control Div., and J. Jerome Sisul, Asst. Atty. Gen., State of Ill., on the brief, for amici curiae States of Cal., Ill., Mich., Minn., Nev., Tex., Vt., Va., Wash., Wis., and New Mexico Health and Environment Dept.

Melinda Kassen, Sr. Atty., and Carolyn Doris, Legal Intern, Environmental Defense Fund, Boulder, Colo., on the brief, for amicus curiae The Environmental Defense Fund, State of Colo.

Before McKAY, Chief Judge, BARRETT and TACHA, Circuit Judges.

TACHA, Circuit Judge.

Appellants appeal the district court's order granting summary judgment in favor of the Colorado Public Utilities Commission ("CPUC") and the State of Colorado. On appeal, the Department of Energy ("DOE") argues that the Hazardous Materials Transportation Uniform Safety Act of 1990 ("HMTUSA") and its implementing regulations preempt the CPUC's regulations requiring carriers of hazardous materials to carry the Colorado State Patrol telephone number and an inspection report in the vehicle, to obtain a state permit, and to provide the state with advance notification of shipment. DOE also asserts that the district court failed to give sufficient deference to an inconsistency ruling by the United States Department of Transportation ("DOT"). We exercise jurisdiction under 28 U.S.C. § 1291 and reverse.

## BACKGROUND

In 1975, Congress enacted the Hazardous Materials Transportation Act, 49 U.S.C.App. § 1801, *et seq.* ("HMTA"). The Act replaced a patchwork of state and federal laws and regulations concerning the transportation of hazardous materials with a scheme of uniform national regulations. *Southern Pac. Transp. v. Public Serv. Comm'n of Nev.*, 909 F.2d 352, 353 (9th Cir.1990); *Jersey Cent. Power & Light Co. v. Lacey*, 772 F.2d 1103, 1112 (3d Cir.1985), *cert. denied*, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986). DOT, pursuant to the HMTA, promulgated the Hazardous Materials Regulations ("HMR"), which categorize and classify hazardous materials and impose various requirements on shippers and carriers for shipping papers, marking, labeling, transport-vehicle placarding, and packaging of hazardous materials. 49 C.F.R. §§ 171–179.

In 1986, Colorado enacted the Colorado Nuclear Materials Transportation Act of 1986 ("CNMTA"), codified at Colo.Rev.Stat. § 40–2.2–101, *et seq.* In May, 1987, the CPUC adopted implementing regulations,

which are codified at 4 Colo.Code Regs. §§ 723–725 ("NT–Regulations"). Under the CNMTA and the NT–Regulations, transporters of nuclear materials must obtain a permit from and pay a fee to a State agency. To obtain a permit, the applicant must submit driver training certificates (including proof of training for mountainous roads), proof of liability insurance, a nuclear incident plan, and a vehicle equipment failure plan. Colo.Rev.Stat. § 40–2.2–201. The CNMTA also requires the carrier to carry the permit with the shipping papers that must be carried pursuant to federal regulation. *Id.* § 40–2.2–203. Further, the CNMTA mandates prenotification of all shipments, including the identity of the shipper, carrier, and receiver, a description of the shipment, the routes to be used, and estimated times of arrival and departure. *Id.* § 40–2.2–209.

In 1988, pursuant to 49 C.F.R. § 107.203, DOE requested an advisory opinion from DOT as to whether the CNMTA and the NT–Regulations were preempted by federal law.[1] DOT found that a number of Colorado's regulations, including all of the regulations at issue in this appeal, were preempted.

In September 1988, the CPUC and Colorado filed an action in the United States District Court for the District of Colorado against DOE, seeking a declaratory judgment that the CNMTA and the NT–Regulations are constitutionally valid and are not preempted by federal law. On January 11, 1989, DOE filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), which subsequently was converted into a motion for summary judgment. Colorado and the CPUC filed a cross motion for summary judgment. After oral argument, at which counsel for both parties conceded that no factual disputes existed, the district court granted Colorado's motion, denied DOE's motion, and ruled that the CNTMA and the

NT–Regulations were not preempted by the HMTA.[2] The district court held that there was no preemption because it was not impossible to comply with both sets of regulations simultaneously and because Colorado's regulations promote safety—a predominant goal of the HMTA.

DOE subsequently filed a notice of appeal in order to challenge four of the NT–Regulations. However, before the appeal could be heard, Congress amended the HMTA by enacting the HMTUSA, 49 U.S.C.App. §§ 1801–1819. When Congress amended the HMTA, it expressly specified the standard for determining whether the statute or its implementing regulations preempt state regulations that regulate in the same area. Congress also strongly reaffirmed that uniformity was the linchpin in the design of the statute. We must now decide whether the HMTUSA and its implementing regulations preempt four of Colorado's NT–Regulations.

## DISCUSSION

█ We review summary judgment orders de novo, using the same standards the district court applies. *Osgood v. State Farm Mut. Auto Ins. Co.*, 848 F.2d 141, 143 (10th Cir.1988). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

### I. Preemption Standards Under the HMTUSA

The Supremacy Clause of Article VI of the Constitution provides Congress with the power to preempt state law. Congress

---

1. Pursuant to 49 C.F.R. § 107.205, a concerned state may submit comments regarding the application for an inconsistency ruling. Colorado declined to submit comments in this case.

2. The district court also ordered that the words "within Colorado" be stricken from 4 Colo.Code Regs. § 723–725 NT–1(d)(4). The district court

stated that "nuclear materials used for medical or research purposes shall be excluded regardless of whether or not they are used in Colorado." Because neither party raises this issue on appeal, we do not address it here and allow this part of the district court order to stand.

can preempt state law in several ways— one of which is express preemption. Express preemption occurs when Congress, in enacting a federal statute, announces a clear intent to preempt state law. *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Express preemption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority also may preempt state law. *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *State Corp. Comm'n of Kan. v. FCC,* 787 F.2d 1421, 1425 (10th Cir.1986).

The HMTUSA, like its predecessor, grants the Secretary of Transportation broad powers to promulgate regulations governing the transportation of hazardous materials: "The Secretary shall issue regulations for the safe transportation of hazardous materials in intrastate, interstate, and foreign commerce. The regulations issued under this section shall govern any aspect of hazardous materials transportation safety which the Secretary deems necessary or appropriate." 49 U.S.C.App. § 1804(a)(1). Pursuant to this section, the Secretary's regulations establish requirements for, among other things, highway routing, driver training, placarding, and shipping papers.

When it enacted the HMTUSA, Congress specified the standards for preemption under the Act by creating three different standards for separate areas of regulation. Section 1819 establishes the highest preemption standard. Pursuant to this section, after the Secretary enacts regulations with regard to motor carrier registration and permitting forms for states that register persons who transport hazardous material by motor vehicle, "no State [may] establish, maintain, or enforce any requirement which relates to the subject matter of such regulation unless such requirement is the *same as* such regulation." 49 U.S.C.App. § 1819(e) (emphasis added).

The second standard applies to certain "covered subjects." Congress stated that "unless otherwise authorized by Federal law, any law, regulation, order, ruling, provision, or other requirement of a State or political subdivision thereof or an Indian tribe, which concerns a subject listed in subparagraph (B) ["covered subjects"] and which is not *substantively the same as* any provision of this Act or any regulation under such provision which concerns such subject, is preempted." *Id.* § 1804(a)(4) (emphasis added). Any regulation issued by the Secretary of Transportation concerning a "covered subject" has the same preemptive effect. *Id.* § 1804(a)(5).

Finally, unless the Secretary waives preemption or the regulation is otherwise authorized by federal law, any regulation, regardless of the subject matter,

> is preempted if—(1) compliance with both the State or political subdivision or Indian tribe requirement and any requirement of this chapter or of a regulation issued under this chapter is not possible, (2) the State or political subdivision or Indian tribe requirement as applied or enforced creates an obstacle to the accomplishment and execution of this chapter or the regulations issued under this chapter, or (3) it is preempted under section 1804(a)(4) of this Appendix or section 1804(b) of this Appendix.

*Id.* § 1811(a).[3] The enactment of these standards demonstrates that Congress clearly intended to preempt state law under certain circumstances.[4] We first must ex-

---

3. This standard replaces the "inconsistency" determination under the HMTA. It codifies the Secretary's regulation relating to preemption that was promulgated to assist in determinations of inconsistency. In turn, this standard derives from Supreme Court precedent that established a way to resolve preemption questions when a conflict arises between federal and state law. *See Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

4. The HMTUSA does not leave state or local governments without recourse when its requirements are preempted. The HMTUSA also provides that the Secretary, upon application of "[a]ny State or political subdivision or Indian tribe," may waive preemption of a requirement "upon a determination that such requirement— (1) affords an equal or greater level of protection to the public than is afforded by the requirements of this chapter or regulations issued under this chapter, and (2) does not unreason-

amine the subject matter of the NT–Regulations at issue to determine which of the three preemption categories applies; then we must determine whether each regulation is preempted under that standard.

## II. Application of the HMTUSA's Preemption Standards

DOE challenges four regulations: NT–3(a), NT–5(c)(5), NT–8, and NT–9. NT–3(a) requires a carrier of hazardous materials to carry the Colorado State Patrol telephone number in the vehicle. NT–5(c)(5) requires an inspection report to be retained in the vehicle while transporting hazardous materials within Colorado. NT–8 requires each carrier to obtain a permit, for which a fee must be paid, and to submit the following information as part of the permit application: a copy of the carrier's driver training program; proof of liability insurance; a nuclear incident plan; and a vehicle equipment failure plan. NT–9 requires the carrier to provide the state with advance notification of the shipment.

### A. Preemption Under § 1819

Because the Secretary has not yet promulgated regulations related to motor carrier registration and permitting forms, we do not address the most restrictive preemption standard under § 1819. Therefore, we next look to the § 1804 standard related to "covered subjects."

### B. Preemption Under § 1804—Covered Subject Preemption

Shipping documents are a "covered subject" under § 1804(a)(4)(B); therefore, any state requirements that "concern" shipping documents must be substantively the same as the federal regulations. Accordingly, if Colorado's regulations pertain to shipping documents, they are preempted unless they are substantively the same as the federal regulations. DOE asserts that "shipping documents" is a broad term and that NT–3(a), NT–5(c)(5), and NT–8 (except the driver training program) all pertain to shipping documents. It contends that "shipping documents" must be understood to extend to any document that a shipper is required to generate, possess, or secure as a condition of transporting a shipment of hazardous materials. After reviewing the statute and regulations, we conclude that such an interpretation is without support.

■ Although the HMTUSA does not define shipping documents, the implementing regulations contain extensive requirements that govern "shipping papers." One such regulation defines a "shipping paper" as a "shipping order, bill of lading, manifest or *other shipping document* serving a similar purpose and containing the information required by [regulation.]" 49 C.F.R. § 171.8 (emphasis added). Further, in 49 U.S.C.App. § 1805(b)(6)(I), Congress authorizes the Secretary to require "training of its hazmat employees" in the area of "[p]reparation of *shipping documents* for transportation of hazardous materials." (Emphasis added.) This reference to "shipping documents," coupled with the previous section's (§ 1804) explanation of the contents and maintenance of "shipping papers," suggests that Congress did not intend a different meaning for the two terms. Thus, from the statute and regulations, we conclude that the terms "shipping document" and "shipping paper" are used interchangeably.[5] Therefore, we examine the regulations relating to "shipping papers" to determine the scope of the term

ably burden commerce." 49 U.S.C.App. § 1811(d). Colorado has not made such an application with respect to the NT–Regulations at issue here.

**5.** Although the meaning of "shipping documents" is not completely clear in the legislative history of the HMTUSA, it appears that Congress used the terms "shipping papers" and "shipping documents" interchangeably. The "Section-by-Section Analysis" of House Report No. 101–444(I) uses the term "shipping documents" and states that "consistency in all aspects of such documents will promote more precise and easier identification of any hazardous material, improve systems for handling hazardous materials, and enhance capabilities for dealing with emergencies associated with the transportation of hazardous materials." H.R.Rep. No. 444 (part I), at 34. These concerns are the same as those that Congress mandated that the Secretary consider when determining the contents of "shipping papers." *See* 49 U.S.C.App. § 1804(g).

"shipping documents" and whether Colorado's regulations seek to regulate in the "shipping documents" arena.

■ The Secretary's regulations, 49 C.F.R. §§ 172.200–172.205, 177.800–177.826, require that shipping papers contain a detailed description of the transported hazardous materials, an emergency response telephone number, and other matters not relevant here. Further, the regulations require that the shipping papers accompany any carrier that transports hazardous materials on public highways. *Id.* § 177.817(a). These regulations do not govern inspection reports, proof of liability insurance, the carrying of a nuclear incident report, or the carrying of a vehicle equipment failure plan. Thus, NT–5(c)(5) and NT–8 do not regulate in the same arena as DOT's shipping paper regulations.

■ However, NT–3(a) does fall within the scope of the shipping paper regulations. NT–3(a) requires the carrier to carry the Colorado State Patrol telephone number along with instructions to "call that number in the event of any incident, accident, or breakdown of equipment." DOT's regulations provide extensive requirements concerning what type of emergency numbers must be carried on the shipping papers. First, the Secretary's regulations require the transporter of hazardous materials to maintain an emergency response number on a shipping paper. *Id.* § 172.604(a)(3); *see also id.* § 172.602(b)(3). Second, the federal regulations specify that the number must be "[t]he number of a person who is either knowledgeable of the hazards and characteristics of the hazardous material being shipped and has comprehensive emergency response and incident mitigation information for that material, or has immediate access to a person who possesses such knowledge and information." *Id.* § 172.604(a)(2). NT–3(a), on the other

hand, requires the motor vehicle operator to carry the number of the Colorado State Patrol with the shipping papers.

Under § 1804(a)(4), we must decide whether NT–3(a)'s requirement is "substantively the same" as the federal regulations. Although "substantively the same" has not yet been defined,[6] it clearly mandates a higher preemption standard than the dual compliance/obstacle standard defined in § 1811(a). Indeed, the term itself denotes that state regulations must contain the same substance as the federal regulations. The Secretary's regulations, unlike Colorado's requirements, do not require that the shipping papers contain the telephone numbers of specific officials of any local jurisdiction through which the material may be transported. Therefore, because Colorado's regulation imposes different requirements than the federal regulation, NT–3(a) is not "substantively the same" and is preempted under § 1804(a)(4).[7]

### C. Preemption Under § 1811(a)—The Obstacle Test

Because the remaining regulations at issue on this appeal do not pertain to covered subjects, we look to § 1811(a) to determine whether Colorado's regulations are preempted. Under § 1811(a), a state requirement is preempted if it is impossible to comply with both the state and federal regulation or if the state requirement creates an obstacle to the accomplishment of the objectives and purposes of the HMTUSA and the HMR.

In deciding this issue, we first address what weight to accord the Secretary of Transportation's advisory, nonbinding opinions. The Supreme Court has held that "[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute

---

6. DOT has proposed that "substantively the same" be defined as "conforming in every respect." A number of illustrations are provided with the notice of proposed rulemaking, all of which indicate that only minor editorial changes would not be preempted. *See* 56 Fed. Reg. 36992–01.

7. We note that a state may require the transporter of hazardous materials to maintain emergency telephone numbers on or with the transporter's route plan. 49 C.F.R. § 177.825(c). Colorado's regulation is preempted because it requires the carrier to carry the Colorado State Patrol number with the shipping papers, not the route plan.

by the officers or agency charged with its administration.... When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *see also Southern Pac. Transp. Co. v. Public Serv. Comm'n of Nev.,* 909 F.2d 352 (9th Cir.1990). We defer to an administrator's construction of his own regulations unless it is "plainly erroneous or inconsistent with the regulation." *Robertson v. Methow Valley Citizens Counsel,* 490 U.S. 332, 109 S.Ct. 1835, 1850, 104 L.Ed.2d 351 (1989) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)).

 In addition to deference with regard to an agency's interpretation of statutes and regulations, we have held that "courts should defer to the judgment of an administrative agency with reference to topics within the agency area of expertise." *Mitzelfelt v. Department of Air Force,* 903 F.2d 1293, 1296 (10th Cir.1990). DOT's expertise, in part, lies in determining the scope and coverage of its regulations and whether Colorado's regulations cover the same subject matter. However, a preemption determination involves matters of law—an area more within the expertise of the courts than within the expertise of the Secretary of Transportation. *See Piper v. Chris–Craft Indus. Inc.,* 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 949 n. 27, 51 L.Ed.2d 124 (1977) (agency's "presumed 'expertise' in the securities-law field is of limited value when the narrow legal issue is peculiarly reserved for judicial resolution, namely whether a cause of action should be implied"); *Jicarilla Apache Tribe v. F.E.R.C.,* 578 F.2d 289, 292–93 (10th Cir. 1978) (great deference not required when administrative decision is not based on expertise in a particular field, but on general common law principles). Therefore, we de-

fer to DOT's determinations that its regulations overlap with Colorado's regulations, but we independently review the legal issue of preemption.

In its inconsistency ruling, DOT directly addressed the regulations remaining at issue on this appeal—NT–5(c)(5), NT–8, and NT–9.[8] With regard to NT–8 (Colorado's permit regulation that requires proof of driver training), the Secretary found that "the Department, through promulgation of 49 C.F.R. § 177.825, has established a near total occupation of the field of training requirements relating to the transportation of radioactive materials." *See* IR–27, 54 Fed.Reg. 16326–01 (April 21, 1989) (quoting IR–8 (appeal), 52 Fed.Reg. 13000–06 (Apr. 20, 1987)). The Secretary found that NT–9 (Colorado's prenotification requirement) "requires greater prenotification than the NRC regulations, which are incorporated into the HMR by 49 C.F.R. § 173.22." *Id.* The Secretary also found that NT–5(c)(5), which requires a carrier to carry an inspection report, creates a requirement in excess of the HMTA's or the HMR's requirements. *Id.* Implicit in all of these rulings is that the NT–Regulations and the HMR seek to regulate in the same arena. After reviewing the NT–Regulations and the HMR, we conclude that the Secretary's determinations are reasonable, and we agree that Colorado's regulations and the Secretary's regulations overlap.

We now must determine whether preemption of Colorado's regulations occurs under § 1811(a). Under § 1811(a), preemption is only appropriate if compliance with federal regulations and Colorado's regulations is impossible or if compliance with Colorado's regulations would create an obstacle to the accomplishment and execution of the HMTUSA or its implementing regulations. DOE concedes that compliance with both sets of regulations is not impossi-

---

8. The Secretary has delegated his authority to make initial administrative decisions about applications for Inconsistency Rulings and about applications for exemptions from preemption to the Director of the Office of Hazardous Materials Transportation, Research and Special Programs Administration, Department of Transpor-

tation. 49 C.F.R. § 107.209. The Director made these particular inconsistency determinations. Administrative appeals are available before the Administrator of the Research and Special Programs Administration. 49 C.F.R. § 107.-211.

ble. Therefore, we only analyze preemption under the obstacle test.[9]

In determining preemption under the obstacle test, the Supreme Court has examined whether the state law " 'stands as an obstacle to the accomplishment and execution of the *full purposes and objectives of Congress.*' " *Hillsborough County v. Automated Medic. Labs.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)) (emphasis added); *see also National Tank Truck Carriers, Inc. v. City of New York*, 677 F.2d 270, 275 (2d Cir.1982). Further, "[a] state law also is preempted if it interferes with the methods by which the federal statute was designed to reach this goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987); *Michigan Canners & Freezers Ass'n v. Agricultural Marketing & Bargaining Bd.*, 467 U.S. 461, 477, 104 S.Ct. 2518, 2527, 81 L.Ed.2d 399 (1984). Therefore, we must identify and understand the goals and purposes of the HMTUSA.

When it enacted the HMTUSA, Congress made a number of findings that relate to the transportation of hazardous materials and the importance of uniform regulations governing the transportation of hazardous materials. Congress stated:

(3) many States and localities have enacted laws and regulations which vary from Federal laws and regulations pertaining to the transportation of hazardous materials, thereby creating the potential for unreasonable hazards in other jurisdictions and confounding shippers and carriers which attempt to comply with multiple and conflicting registration, permitting, routing, notification, and other regulatory requirements,

(4) because of the potential risks to life, property, and the environment posed by unintentional releases of hazardous materials, consistency in laws and regulations governing the transportation of hazardous materials is necessary and desirable,

(5) in order to achieve greater uniformity and to promote the public health, welfare, and safety at all levels, Federal standards for regulating the transportation of hazardous materials in intrastate, interstate, and foreign commerce are necessary and desirable.

49 U.S.C.App. § 1801 (congressional declaration of policy); *cf. National Tank Truck Carriers, Inc. v. Burke*, 608 F.2d 819, 824 (1st Cir.1979) (analyzing the HMTA and stating that "there is strong support for the notion that a primary Congressional purpose intended to be achieved through the legislation was to secure a general pattern of uniform national regulations").

Congressional committees echoed the importance of uniform safety regulations. The report of the House Committee on Energy and Commerce noted that the House Bill "reflects the view that a high degree of uniformity of Federal, State, and local laws is required in order to promote safety and to encourage the free flow of commerce." H.R.Rep. No. 444 (Part 1), 101st Cong., 2d Sess., at 22 (1990). The Senate Committee on Commerce, Science and Transportation, which reported the bill that amended HMTA, stated that the "original intent of the HMTA was to authorize the Department of Transportation with the regulatory and enforcement authority ... to preclude a multiplicity of State and local regulations and the potential for varying as well as conflicting regulations." S.Rep. No. 449, 101st Cong. 2d Sess., at 2 (1990), *reprinted in* 1990 U.S.Code Cong. & Admin.News 4595, 4596. Further, the debate on the floor of Congress reveals that Congress determined that uniformity would ensure safety. *See* 136 Cong.Rec. H13645–03 (remarks of Rep. Luken) ("This bill provides for uniform Federal, State, and local laws in certain technical areas, thus ensuring the safe and efficient transportation of hazardous materials throughout the country."); 136 Cong.Rec. H13645–03 (remarks

---

**9.** Because § 1811(a)'s obstacle test codifies a judicially created test for determining when a federal statute impliedly preempts state law, *see Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), the line of cases developing the obstacle test is instructive to our application of § 1811(a).

of Rep. Hammerschmidt) ("this bill will provide a strong framework for uniform regulation in critical areas such as classification, marking, and handling of hazardous materials"). Thus, in enacting new preemption standards, Congress expressly contemplated that the Secretary would employ his powers to achieve safety by enhancing uniformity in the regulation of hazardous materials transportation. Given this congressional purpose, we must determine whether Colorado's regulations create an obstacle "to the accomplishment and execution" of the HMTUSA or the HMR. 49 U.S.C.App. § 1811(a).

### 1. NT–8—Permit Requirements

We begin by analyzing NT–8, which requires a carrier to obtain a permit before it may transport hazardous materials. In order to obtain a permit, the carrier must submit a copy of the carrier's driver training program (including training for mountainous driving), proof of liability insurance, a nuclear incident plan, and a vehicle equipment failure plan.

#### a. Driver training requirements

■ In order to receive a State permit, a carrier must submit "a copy of the company's driver training program," and "[i]f the route to be traveled includes mountain driving (i.e., travel west of I–25 into or through the mountains), describe the training program which specifically involves the preparation for driving on mountainous roads under all types of weather conditions." 40 Colo.Regs. § 2.2–201, NT Appendix 8–A. Colorado contends that NT–8(a) furthers the HMTUSA's goals by ensuring safety and enforcement of the driver training requirement.

The Secretary's regulations concerning training for drivers transporting radioactive materials are extensive; coverage includes training in the requirements of the federal rules, "the properties and hazards

of the radioactive materials being transported," and emergency procedures. 49 C.F.R. § 177.825(d). The Secretary's regulations do not require a carrier to undergo mountain training or to submit proof of the completion of a driver training program to local authorities. Thus, Colorado's regulations go far beyond the HMR.

#### b. Insurance requirements

■ Colorado requires carriers to submit proof of insurance to the CPUC as part of the permit application. The Secretary's regulations do not, unlike Colorado's requirements, require the carrier to provide proof of insurance to officials of any of the various local jurisdictions through which hazardous materials are transported. We also note that the Secretary, in regulations promulgated under the Motor Carrier Safety Act, requires a motor carrier to retain proof of required insurance at his principal place of business and allow any member of the public to review this information. 49 C.F.R. § 387.7(d) & (e).[10] Therefore, Colorado's proof-of-insurance requirement causes a carrier of hazardous materials to submit more documentation than contemplated in the HMTUSA or other federal acts related to transportation.

#### c. Nuclear incident clean-up plan

■ Colorado requires the carrier to submit a plan to local officials that includes provisions for removing a truck and its cargo from an accident scene, preventing or minimizing radioactivity releases, and decontaminating the environment. This requirement specifically overlaps the provisions of 49 C.F.R. § 177.825(d), which provides that a driver must be trained in the procedures to follow in case of an accident or emergency. Colorado's regulations expand on federal regulations, requiring a carrier to generate more documentation and then supply that same documentation to a local authority.

---

**10.** Colorado asserts that the Motor Carrier Safety Act ("MCSA") authorizes Colorado's insurance requirement because the Act does not preempt such a requirement. Colorado then concludes that this court must apply the preemption standards utilized under the MCSA to

this regulation. We disagree. Section 1811(a) exempts a state regulation from preemption if it is "otherwise authorized by Federal law." The fact that the MCSA does not preempt Colorado's requirement cannot be construed as an authorization of the regulation.

### d. Vehicle equipment failure plan

Colorado requires the carrier to submit to the CPUC a plan for replacing or repairing equipment that has been placed out of service or that has become inoperative for other reasons. Vehicle equipment is regulated by the HMR only to the extent the HMR incorporates the Federal Motor Carrier Safety Regulations by reference. 49 C.F.R. § 177.804. Although the Secretary's regulations establish requirements for driver training and require drivers to carry certificates of completion of the required training, 49 C.F.R. § 177.825(d), the regulations do not, unlike Colorado's requirements, require drivers to submit these documents, in advance, to officials in the various jurisdictions through which they transport hazardous materials.

All four of these provisions require carriers to generate and to submit documentation to local authorities that is in excess of the HMR's documentation requirements. The Secretary's regulations contain hundreds of information and documentation requirements, all of which have been established by the Secretary to ensure the health and safety of citizens in every jurisdiction. Congress specifically found that additional documentation and information requirements in one jurisdiction create "unreasonable hazards in other jurisdictions" and could confound "shippers and carriers which attempt to comply with multiple and conflicting regulations." 49 U.S.C.App. § 1801.

Colorado's regulations clearly exceed the information and documentation requirements set forth in the Secretary of Transportation's regulations governing the transportation of radioactive materials. The enactment of separate information and documentation requirements in even a few of the thousands of local jurisdictions across the country would lead to the multiplicitous regulations Congress sought to avoid by enacting the HMTUSA.[11] Because Colorado's regulation forces transporters of hazardous materials to generate and maintain additional documentation and information, we conclude that it is likely to confound shippers and carriers and to increase the potential for hazards in other jurisdictions. Colorado's regulations simply do not further the federal purpose of promoting safety through uniformity. Therefore, we hold that NT–8 is preempted.[12]

### 2. NT–9—Prenotification Requirements

The Secretary requires advance notification to the Governor of a state or his designee by shippers of "irradiated reactor fuel" or in circumstances where such notification is required by the Nuclear Regulatory Commission. 49 C.F.R. § 173.22(c); 10 C.F.R. § 73.37. NT–9, however, requires prenotification by those who transport other categories of nuclear materials as well. Further, Colorado's prenotification requirements are extensive, requiring "[t]he name, address, and telephone number of the shipper, carrier, and receiver," a description of the materials to be transported, a listing of routes, the transport index, and the estimated dates and times of arrival and departure.

Congress expressly found that state "notification" requirements that "vary from Federal laws and regulations" create "unreasonable hazards" and pose "a serious threat to public health and safety." 49 U.S.C.App. § 1801. Colorado's prenotifica-

---

**11.** In addition to obstructing Congress' objective that safety be achieved through uniformity, the expense of overburdensome documentation and information requirements also is contrary to Congress' intent that regulation of hazardous materials transportation be as cost-effective as possible. In its findings accompanying the enactment of the HMTUSA, Congress mentioned the need for "reasonable, adequate and *cost-effective* protection from the risk posed by the transportation of hazardous materials." 49 U.S.C.App. § 1801 (Congressional Findings) (emphasis added). Congress also stated that

"the movement of hazardous materials in commerce is necessary and desirable to maintain economic vitality and meet consumer demands, and shall be conducted in a safe and efficient manner." *Id.*

**12.** DOE does not contend that Colorado's permit fees are unreasonable. Therefore, we do not reach this issue. Instead, we hold that because the underlying requirements of NT–8 constitute obstacles to the HMTUSA, the regulation is preempted.

tion requirement varies from federal law, poses a threat to uniformity, and thereby threatens public safety and obstructs the purpose and objective of Congress and the Secretary. Therefore, we conclude that NT–9 is preempted.

3. NT–5(c)(5)—Inspection Reports Requirements

 NT–5(c)(5) requires the carrier to retain an inspection report in the vehicle while transporting hazardous materials. The Secretary's regulations require the owner and the motor carrier to retain a copy of the inspection report, 49 C.F.R. § 396.3(b),[13] but do not require the report to be carried in the vehicle. The Secretary's regulations require only that a limited amount of documentation be carried in the vehicle, which avoids carrier confusion and promotes quick access to critical documentation. Colorado's requirement of additional information could create confusion in an emergency situation and could thereby increase the potential hazard of transporting nuclear waste. Therefore, we also conclude that NT–5(c)(5) obstructs the congressional purpose and is preempted.

### III. Conclusion

We do not doubt that Colorado's regulations were implemented to enhance safety in the State of Colorado. However, "[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta*, 458 U.S. 141,

153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962)). Congress enacted the HMTUSA to enhance safety throughout the country. To accomplish this purpose, Congress concluded that uniform standards are necessary and desirable. Uniformity and safety are not at odds. We must not balance one against the other. Rather, Congress stated unequivocally that the "Federal standards for regulating the transportation of hazardous materials" were necessary "to achieve greater uniformity and to promote the public health, welfare, and safety at all levels." 49 U.S.C.App. § 1801.[14]

With this statement, Congress directed that safety be achieved through uniformity. Colorado's regulations inhibit and obstruct uniformity by mandating extensive information and documentation requirements that are likely to confound the transporters of hazardous materials, thereby increasing the potential for unreasonable hazards throughout the country. Because Colorado's regulations obstruct the purposes and objectives of Congress, we conclude that they are preempted by the HMTUSA and the HMR.

To the extent that the district court held that NT–3(a), NT–5(c)(5), NT–8, and NT–9 are not preempted, we REVERSE.

---

**13.** 49 C.F.R. § 396.3(b) is incorporated by reference to the HMR. 49 C.F.R. § 177.804.

**14.** In the context of other federal statutes, courts have recognized that when Congress adopts uniformity as a method for achieving the

goal of safety, state remedies or regulations that interfere with Congress' uniform scheme are preempted. *See Wood v. General Motors Corp.,* 865 F.2d 395, 408 (1st Cir.1988); *Kelly v. Carr,* 691 F.2d 800, 804 (6th Cir.1980).